THE HOUSTON AND GREAT NORTHERN R. R. Co. v. A. WINTER AND C. A. ABERCROMBIE AND WIFE.

1. HOMESTEAD is defined to be "the place of the house;" the mansion house with adjoining land.
2. SAME—RURAL HOMESTEAD.—The object of the Constitution was not to protect the house with two hundred acres of the most valuable land, but to protect the house and the farm, tan-yard, mill, gin, or whatever else had been used in connection with the residence to make a support for the family.
3. SAME.—What is meant by "the homestead of a family" in the country and its approximate locality is determinable by obvious facts, as a determinate object, and not by the variable intention privately entertained or openly declared by the husband, he and his wife residing on the land in their home at the time; and under the same circumstances, where the residence is on a large tract, most of which being inclosed, the locality of what part of it is not a part of the homestead is determinable in the same way, approximately.
4. SAME.—The residence and farm used in support of the family, being upon one part of a large tract of land, is a designation of the homestead more authoritative and notorious than mere lines run through and marking out other lands upon the tract as the homestead.
5. CHANGE OF HOMESTEAD.—The marking out of lines upon a large tract of land, so as to include lands remote from the dwelling-house and unused before in connection with the support of the family, is no less an attempt to make a new homestead than if the house had been moved to such new locality after a lien had been acquired upon that part attempted to be appropriated as homestead by such removal.
6. INTENT—HOMESTEAD.—The question of intent becomes important in some cases, so as to determine whether a party has acquired a homestead at all, as in case of domicile, or whether he has abandoned his homestead, or which one of two houses, when he resides sometimes in each, is his homestead, or which of two fields used in connection with his rural occupation is to be preferred when both cannot be held.

7. ACTS HELD A DESIGNATION OF HOMESTEAD.—Where a person is the occupant of a large tract of land, with a mansion-house surrounded by or contiguous to his farm, which he uses in his calling as a means of support, most of the tract being wood land or prairie, or consisting of a number of tracts, some of which are not used at all, such facts determine substantially and approximately the locality of his homestead, and the locality of portions of such large tract not so used to be not his homestead, or part of it, irrespective of his intention at the time.

8. CHANGE OF HOMESTEAD.—A change of designation of homestead upon such large tract of land by moving the houses, or by changing the boundaries of it substantially different from the locality which the pre-existing facts of ostensible use and enjoyment have fixed as a homestead, cannot be made, to the injury or destruction of rights of judgment lien holders, or of purchasers from the husband without the wife being joined, and existing before such attempted change.

APPEAL from Walker. Tried below before the Hon. J. R. Burnett.

The Houston and Great Northern Railroad Company brought trespass to try title against A. Winter, for 320 acres of land.

Winter pleaded not guilty, and C. A. Abercrombie, as landlord, came in and answered, claiming 157 acres of the land sued for, as the homestead of himself and family.

Plaintiff amended, setting out its title, and alleging fraud in the defendant, Abercrombie, in so designating the boundaries of his homestead as to deprive plaintiff of its right in the land sued for and vested prior to such designation. Plaintiff also asked that a title bond of. Abercrombie, owned by plaintiff, for 100 acres of the land, be specifically enforced, and that the land so claimed by the defendant in his answer be protected against defendant in his designation of homestead boundaries.

Mrs. Melinda Abercrombie, wife of defendant, also intervened, resisting the enforcement of the husband's bond for said 100 acres, because it included part of her homestead and was not executed by her.

The material facts of the case are as follows:

C. A. Abercrombie was the owner in fee of 1,370 acres of land, composed of five adjoining tracts, to wit, the Goodrich survey of 480 acres, the Sam Houston survey of 200 acres, the Palmer survey of 320 acres, the McGary survey of 320 acres, and 50 acres of the Shepherd survey, situate as shown by the following map.

Prior to 1860 and up to the close of the war, Abercrombie had in cultivation of these lands about four hundred acres, composed of about one-half the Goodrich tract, part of the McGary and Shepherd tracts, and about twenty-five or thirty acres on the Palmer tract. His fence was on the Palmer tract, about eighty yards north of the dividing line between that and the McGary tract. Before the war he had in cultivation a few acres of the Palmer tract, which is the one in controversy, but this has not been under fence or in cultivation since the close of the war. This plantation was and yet is occupied by appellee, his dwelling and servants' houses being on the Sam Houston tract; his tan yard, ginhouse, stables, cribs, and horse lot being on the Goodrich tract, as represented on diagram.

In December, 1860, the husband mortgaged all of these lands, except the Palmer tract, to McGary, to secure the payment of a debt to him, and intended to include the Palmer tract, and thought it was included until shortly before appellant purchased at a sheriff's sale. This mortgage debt has not been paid, nor the mortgage foreclosed, and appellee admits that he and McGary were friendly, and that it has always been understood, and McGary has always said, that appellee should not be disturbed in the use of the mortgaged lands as a homestead, but should have a homestead on them as long as appellee lives.

In 1865 a judgment was rendered in the District Court of Walker county against appellee and others for several hundred dollars in favor of one Edwards, which was recorded in October, 1866, and remained unsatisfied until the Palmer tract was sold under it, in March, 1872, when appellant became the purchaser.

In July, 1871, and while appellee was yet under the impression that the Palmer tract was included in the McGary mortgage, and with a view to secure the construction and early completion of a section of the Huntsville Branch Railway and its junction with appellant's road at a particular point

on the Palmer tract of land, appellee made and delivered to the Huntsville Branch Railway Company his title bond for one hundred acres of land on appellant's road at the point where the same crosses the Cold-Springs road. This was part of the Palmer tract. The title bond purports to be a bonus and inducement to secure the connection of this road by a specified time at the point therein designated, and is conditioned that the Huntsville Branch Railway Company " would construct, build, and put into successful operation, for transportation of freight and passengers by steam car by the time therein mentioned, a railroad from some point on and connecting with said Houston and Great Northern Railroad to a point for and as a depot within three-fourths of a mile of the court house at Huntsville; said road to be located, built, and operated in all respects within the intent and meaning of the charter of said Huntsville Branch Railway Company;" supposing the land was included in the McGary mortgage, the donation was made " subject to the approval of the parties holding the mortgage."

This portion of the Huntsville Branch Railway was completed within the time specified and in the manner stipulated, and its connections with appellant's road made at the point designated in said title bond, so that all the conditions of the title bond intended to be performed by the Huntsville Branch Railway Company were performed by appellant as contractor for its construction, and by virtue of this contract appellant became the owner of said title bond. The Huntsville Branch Railway was constructed within the first three months of 1872, and after its junction was formed with appellant's road, and it became important to perfect title to the land, McGary refused to join Abercrombie in the conveyance of the one hundred acres named in Abercrombie's title bond, and then, for the first time, it was discovered that the Chance or Palmer tract was not covered by the mortgage, but was subject to the Edwards judgment obtained in 1865. Appellee then tried to purchase this judgment in

the name of his wife, but failing in this, and learning that appellant was negotiating for the purchase of it, so as to perfect the title of the land on which it had been induced to create the junction of said roads and erect its depot buildings, he then procured the surveyor and laid out his homestead, as shown in diagram above.

Appellant purchased the judgment and sold the Palmer tract under it and bought it, paying therefor about five or six hundred dollars, with notice of the destination of homestead boundaries by Abercrombie.

The court charged the jury as follows :

"The plaintiff sues defendant for 320 acres of land set out in the petition. The other defendant, Abercrombie, defends Winter's possession, he being only a tenant, and claims that 157 acres of the land in controversy is embraced in his (Abercrombie's) homestead. The intervenor, Mrs. Abercrombie, joins her husband in asserting the homestead claim." * * * * "The main question, upon the finding of which your verdict depends, is, was or was not the 157 acres of the land in controversy embraced in the homestead of Abercrombie and wife at the time of the sheriff's sale on the execution read in evidence ?"

"Our State Constitution provides that 'the homestead of a family, not to exceed two hundred acres of land, shall not be subject to forced sale for any debts thereafter contracted.'

"To constitute a homestead, the family must have a house on the place and reside on it. And where a family resides on the place the homestead right attaches, and the limit allowed to a country homestead is fixed by quantity not to exceed 200 acres. When a homestead is designated, it cannot be sold to satisfy the claims or liens of creditors except where the purchase-money remains unpaid. But a party having a homestead is not permitted under this exemption to fraudulently remove his former homestead and fix his residence on a portion of his lands upon which there is a lien or mortgage. Nor has he a right to change his home-

stead boundaries so as to include a portion of land which he has induced by his acts and conduct another party to purchase or incur on account of it losses or liabilities, under the belief that such portion would not be claimed under the exemption. He has however the right to change in good faith his homestead so as to include more valuable lands, provided that it still embraces his residence and the lands are adjoining or used for purposes connected with family uses. If then in this case, after a careful and impartial consideration of the facts and circumstances in evidence, you believe that Abercrombie, having a homestead of 200 acres, including his residence, and not including any part of the land in controversy, did by his acts or conduct induce the plaintiff or its agent to purchase the land in controversy, or to incur damages or losses on account of it, believing that no exemption would be claimed for the same, and after such inducement changed his homestead so as to include any part of the land in controversy, then such change was fraudulent and void as to the plaintiff to the extent of such part, and you will find for the plaintiff. But if upon such consideration of the evidence you believe that no such inducements were made, or if made, were recanted in the presence of plaintiff's agent acting in the matter before any such damage was incurred, and further, that at the time of the sheriff's sale, Abercrombie had, with a view of benefiting himself, and without the intent to defraud the plaintiff, designated his homestead by boundaries which include the 157 acres as claimed by him, then he had the legal right to so designate his homestead, and you will find for the defendant and intervenor.

"The fact that Abercrombie's lands were mortgaged to McGary did not prevent him (Abercrombie) from asserting his homestead on the mortgaged lands, because the homestead right was, under the Constitution, superior to the mortgage, and he had a right therefore to claim his homestead of 200 acres of the mortgaged lands. But he still had the

right to change his homestead so as to exclude a portion of his old fields and include more valuable timbered or other lands, provided he so changed it without fraud against the plaintiff and before the sale under which plaintiff purchased. Whether Abercrombie in changing his homestead boundaries did so in fraud of plaintiff is a question of fact, and you will determine it upon an application of the foregoing instructions to the evidence.

"Fraud is never presumed, but must be proved, though it can be and is generally proved by circumstances.

" As to the bond of Abercrombie to convey 100 acres of land to the Huntsville Branch Railway, it cannot be enforced against the homestead, if you find that the homestead is satisfactorily established and includes said 100 acres. But if you find for the defendants and intervenor on the issues presented in the general charge, and believe from the evidence that, subsequently to the execution of the bond and the fulfilment of the conditions expressed in the bond, Abercrombie, then having his homestead on other portions of his land, did change his homestead boundaries so as to include the 100 acres agreed to be conveyed in the bond, with a view to defraud the Huntsville Branch Railway Company or the plaintiff, then you will find for plaintiff on said bond, and that the plaintiff is entitled to have a verdict for said 100 acres; and if you so find, state off what portion of the Palmer tract said 100 acres shall be taken least detrimental to the homestead as designated. If, however, you find that Abercrombie, in designating his homestead, did not do so with any intent to defraud the railway company, but with a view of benefiting himself, then the bond cannot be enforced, and you will find on this issue for the defendants and intervenor. In case you find for the defendants and intervenor on the whole case, and the proof shows that the plaintiff has trespassed upon the homestead by cutting timber, then find for Abercrombie and wife the reasonable

value of the damages proved, not to exceed the amount claimed by them, to wit, one hundred dollars.''

The jury found a verdict for defendants and the intervenor, and damages at one hundred dollars.

Abercrombie having disclaimed to all of the tract sued for but the 157 acres claimed as part of the homestead, judgment was rendered for Abercrombie and wife for that part of the land sued for, the damages found, and costs.

Motion for new trial was overruled, and plaintiff appealed.

*Baker & Botts*, for appellant.

*J. M. Maxey*, for appellees.

ROBERTS, CHIEF JUSTICE.—The question in this case is, did C. A. Abercrombie have the right to designate and locate by a survey his homestead in the manner in which he did, and thereby defeat the claim of the railroad company to the land in controversy, to the extent of one hundred and fifty-seven acres of land in the Palmer survey.

The judgment in favor of Edwards against Abercrombie, constituting a lien upon the Palmer tract of three hundred and twenty acres of land, being in force at the time the law was passed in 1866 making judgments afterwards rendered a lien upon lands in the county where rendered, it thenceforward constituted a lien, whether it was recorded or not. So it has been held by this court. There was a mortgage on all of the balance of his land, except the Palmer tract, of a date prior to the judgment, but which constituted no obstacle to his homestead right, not having been signed by his wife, and having been executed after his homestead right was fully acquired. The levy upon and sale of the Palmer land passed the title to the whole of it to the company, unless the designation of the 157 acres of it as a homestead, after the judgment was rendered and before the levy and sale, defeated the lien and prevented the title from passing by the sale under the execution and judgment.

The bond for title to one hundred acres in the north corner of the Palmer survey, given by Abercrombie to the company, (or to the company of which the plaintiff is the admitted successor in interest,) was valid, so as to secure a title to it, unless prevented by the subsequent designation of the homestead, it having been alleged and proved that the conditions of the bond which constituted the consideration had been fully complied with. The bond was given, as shown on its face, to enable the company to erect a railroad depot upon the 100-acre tract contracted to be conveyed.

Without undertaking to pass authoritatively upon the weight of the evidence, this may be assumed to be the attitude of the case, as presented by the record before us, in considering the main question involved, as it is previously stated: Abercrombie had long owned a large tract of land upon five surveys, (about 1,400 acres,) the whole together being of an irregular shape. His house and a large farm were mostly on two tracts, reaching but a few yards on to the Palmer survey. The balance of the Palmer survey was thin pine woodland, except a small field that had been thrown out in its north corner, where the depot was located. It is stated that much of the large farm is worn and turned out, and it is not distinctly shown what part of the farm, as it formerly existed, was still in cultivation. The depot is over a mile from the residence of Abercrombie. The homestead, as claimed and laid off, consists of a block of 157 acres of land, nearly in a square, in the north corner of the Palmer survey, including the depot, and being all in the pine woods except the turned-out field of thirty acres, and another small irregular block embracing the gin and tan yard, which is connected with the larger block by a strip 180 varas wide and one-half mile long, which small block and the strip contain 43 acres.

It should be here observed, that the land called for in the bond had a fixed location, by the terms of the bond, in the

north corner of the Palmer survey, embraced in the said large block designated as part of the homestead, and also that the judgment could be enforced to any effect only on the Palmer survey, on account of a prior mortgage lien upon all the balance of the land to secure a large debt; and further, that there were other lands that could as easily have been embraced in an irregular designation far more valuable and appropriate for farming purposes, being rich black land.

The court charged the jury that " when a homestead is designated it cannot be sold to satisfy the claims or liens of creditors, except where the purchase-money remains unpaid. But a party having a homestead is not permitted, under this exemption, to fraudulently remove his former homestead and fix his residence on a portion of his lands upon which there is a lien or mortgage; nor has he a right to change his homestead boundaries so as to include a portion of land which he has induced, by his acts and conduct, another party to purchase, or incur expense on account of it, or losses or liabilities, under the belief that such portion would not be claimed under the exemption. He has, however, the right to change, in good faith, his homestead so as to include more valuable lands, provided it still embraces his residence and the lands are adjoining or used for purposes connected with the family uses."

This charge, in effect, informs the jury that a homestead, being designated, cannot be sold, &c., and when once designated, its boundaries cannot be changed so as to cover land that his acts and conduct (what acts and conduct?) have induced other persons to purchase, and that he may change it so as to include more valuable lands, if done in good faith, and such lands be adjoining the residence, or used for purposes connected with family uses. This charge goes upon the idea that the homestead had been fixed with boundaries before it was designated and run off, just before the levy and sale, whereas no such thing was alleged or

proved. It proceeds on the idea, also, that there could be no other sufficient inducement presented to others to purchase, than that arising out of the acts and conduct of Abercrombie; whereas, as will be hereafter seen, his permitting appearances to exist, as indicating the locality of his homestead on his large tract of land, was as well calculated to deceive and entrap others as his affirmative acts or conduct could be. And this idea runs through the whole charge. This charge relates to the purchase under the judgment, and it is not very clear what is meant by the " change of the homestead in good faith, so as to include more valuable lands," contained in the latter portion of the charge quoted. But the right to change so as to include more valuable lands is laid down plainly in the charge, having direct reference to the bond, which is in the following language: "If, however, you find that Abercrombie, in designating his homestead, did not do so with any intent to defraud the railway company, but with a view of benefiting himself, then the bond cannot be enforced, and you will find on this issue for the defendant and intervenor."

This charge of the court made Abercrombie's right to include the land in controversy in his homestead to depend, upon whether he intended thereby to defeat the company in the acquisition of the land under the bond, or to appropriate the land in good faith for his own benefit and advantage. The charge asked by the plaintiff and refused by the court was, in substance, that if Abercrombie gave a bond for title to land, which was at the time not included in his improvements, and sufficient was left, including his residence and improvements, he could not afterwards lay off and designate his homestead so as to defeat the bond; and so if a judgment lien attached to the land, under similar circumstances, he could not defeat the levy and sale of the land by such a designation of the homestead made after the date of the judgment and before the levy and sale. The charges given and refused present the subject in various lights, not al-

ways very distinct, but it is believed that the above summary statement sufficiently presents them, and shows the contrast between them in reference to the rule by which the jury should be governed in determining the validity of the homestead claim, as set up by Abercrombie in defense of his right as against his bond, and the sale under the judgment.

In ascertaining the exact meaning of the charge of the court, it must be considered that if the designation of the homestead was valid, it had the effect to defeat the bond and execution sale as to the land in controversy, and thereby worked an injury upon the company necessarily. It is equally obvious that including the 157 acres in the homestead, on which the depot was located, though thin pine land mostly, would be more valuable for some purpose, particularly for sale, or for use connected with the depot, than the same quantity of better land in other parts of the tract, and therefore an appropriation of that land would necessarily be a benefit in the way of pecuniary advantage to Abercrombie. These two results would follow necessarily, and therefore he may be presumed to have intended both of them. But which one of the two—the intention to defeat the company in the acquisition of the land to its damage, or the intention to benefit himself pecuniarily—was the predominant, controlling intent with which he took in this land in designating his homestead? Upon the answer to this question, if the jury understood the charge, the validity of the homestead, as designated, depended in finding their verdict in reference to the bond. A similar distinction, as to the influencing motive, is sometimes necessary to be drawn in determining whether or not a sale of property has been made to hinder, delay, or defraud creditors, which may be referred to in illustration of the specific intention which is made to control the issue in the charge of the court in this case. (Baldwin *v.* Peet, 22 Tex., 716, 717.)

The leading objections to the charge are, then, in making the validity of the designation of the land, in protecting it

against the bond, dependent upon the specific intention here indicated; and in making nothing short of the deceptive acts and conduct of Abercrombie (and they not disclosed and pointed out) sufficient to debar him from defeating the purchase of the land, by designating his homestead after the lien was acquired upon it, as applicable to the facts of this case.

The Constitution exempts from forced sale "the homestead of a family not to exceed two hundred acres of land." (Const., 1869, sec. 15, art. 11.)

It was first introduced in the Constitution of 1845, and has been reinserted in every Constitution adopted since that time.

If the homestead is more than two hundred acres of land, then only that quantity of it is secured; and if it be that or less, then all of it is secured. It is not defined in any of the Constitutions, nor are its qualities, attributes, or shape expressed further than in the use of the words "homestead of a family not to exceed two hundred acres." That would imply, that it was thought to be something that could be known without any further description. It is a definite, ostensible object, to the extent of being the place, which is made the home of the family. It has had some legislative interpretation. The act of 1839, in which it originated, described it as "fifty acres of land, or one town lot, including his or her homestead and improvements, not exceeding five hundred dollars in value." (Hart. Dig., art. 1270.) So, too, the act of 1866 describes it as "two hundred acres of land, including his or her homestead." (Paschal's Dig., art. 6831.) Homestead is defined to be "the place of the house," "the mansion house, with adjoining land." (Worcester's Dic.; Bouvier's Law Dic.)

It has received judicial interpretation in many respects. "A man's homestead must be his place of residence; the place where he lives." (Philio v. Smalley, 23 Tex., 502.) In the case of Franklin v. Coffee, Chief Justice Wheeler, in

describing what is not a homestead, says: "In this case there was no house or home upon the land. He had made no preparation or done no acts which would evince a fixed intention and purpose to select and appropriate the place as a home." (18 Tex., 417.) On the contrary, in the case of Stone *v.* Darnell, such acts were done as were said to indicate the intention to appropriate the place as a home, and although not a home literally when levied on, but being such at the sale, it was exempt as a homestead. (20 Tex., 15.) The use made of the land may determine its character as part of a homestead or not, as well as its proximity to or remoteness from the residence or mansion house. (Pryor *v.* Stone, 19 Tex., 373, 374; Methery *v.* Walker, 17 Tex., 594.) Such use is an object of observation, which indicates and is notice of appropriation for homestead purposes.

In 1845 most persons who lived in the country were in possession of tracts larger than two hundred acres of land, and generally farms were attached to or situated near their residences. They were of no uniform shape or size; and still, then it was deemed a sufficient description of that which was secured to the family out of those large tracts to call it the "homestead of a family." The object of the Constitution was not to protect the house with two hundred acres of the most valuable land that might be on a large tract, but to protect the house and the farm, tan yard, mill, gin, or whatever had been used in connection with the residence to make a support for the family.

This was an object so definite and easy of ascertainment, even though its exact boundaries might not be defined, that the husband was prohibited by law from conveying it away, except with the consent of the wife. Every one dealing with the husband had to take notice of its locality on the land. An officer could not levy on it and make a valid sale of it, even to one who never saw it or heard of its being the homestead of the family; nor would the matter be mended by its having been pointed out for levy by the husband.

What is meant by "the homestead of the family" in the country and its approximate locality is determinable by obvious facts, as a determinate object, and not by the variable intention, privately entertained, or openly declared by the husband, he and his wife residing on the land in their home at the time. Under the same circumstances, where the residence is on a large tract of twelve or fiftcen hundred acres, most of which being uncleared, the locality of what portion of it is not a part of the homestead is determinable in the same way approximately.

Suppose, for instance, a man residing in his house on a farm of one hundred acres of land, on the northeast corner of his league of land, the balance all being uncultivated and not otherwise in use, is it not as certainly determinable, by the obvious appearances of fixed facts, that the two hundred acres in the southwest corner of the land is not the locality of the homestead as that the homestead is located in the northeast corner, where the house and farm are?

Suppose 100 acres in the southwest corner are levied on, can he defeat the sale by running out an acre around his house, and then running off a strip thirty feet wide three miles to a block, including the balance of the 200 acres in the southwest corner of the league, and claiming the same as a homestead? If so, the wife can be deprived of the farm, or even of the garden at the door of the house, by another levy and sale. According to the opinion of Chief Justice Hemphill, he could not, in such a case, even move his house from one corner to the other, and claim a homestead after such a levy. In the case of Stone *v.* Darnell, (20 Tex., 14,) after laying down in the strongest terms that if it is the homestead on the day of sale, it is exempt, he says: "This is the general principle. There may be and doubtless are exceptions ; as, for instance, where one removes from his former homestead, and fixes his residence on a portion of his lands upon which there had been a levy. Such proceeding would be regarded as fraudulent,

which might be shown by the purchaser at the sheriff's sale, and would protect his title against the claim of the homestead thus fraudulently acquired.'' Such a principle would hardly be conceded as an exception by the great champion of the homestead right unless it had been good law. In the sale of real property under execution, it is the judgment that gives the lien and secures the right, rather than the levy, which but locates it, to be perfected by sale. This is termed by the chief justice an exception to the general rule. It is respectfully submitted, that the case he states is rather the enforcement of a lien that underlies the attempted acquisition of a new homestead, rather than an exception. If he has plenty of other land to pay the debt, he may exercise the right of pointing out property to be sold, and thereby relieve a particular tract on which there was a judgment lien. There could be no fraud in that. But that would not be a defeat of the lien on the land by a relocation of the homestead. In the case which was supposed by me, of a homestead on the league of land, the house and farm, and the uses made of them, spoke a silent language, proclaiming the locality of the homestead to every one. It is a designation of the homestead more authoritative and notorious than lines run through old fields, prairies, or even woods by the husband. And if the lines be run in the way supposed, it is no less an attempt to make a new homestead, as to its boundaries, than if the house had been moved to the new locality after the lien had been acquired. The facts and circumstances surrounding the actual homestead constitute, in and of themselves, a designation of the locality, with approximate though not definitely and exactly fixed boundaries. Under this idea, Chief Justice Wheeler said, in the case of Mackey v. Wallace, 26 Tex., 529: ''It would seem, moreover, that it is the right of the debtor to designate the land included in his homestead exemption, subject only to the qualification that he must include his improvements.''

Why include the improvements? Because the use of the improvements is the object of a residence in the country as a means of support, the security of which to every family it was the cherished object of the framers of the Constitution to attain, by the exemption of the homestead. They enter into and form part of the homestead. As to how much of the improvements, and how much unimproved or woodland may be included in the two hundred acres selected and designated as a homestead, is not subject to any fixed rule, and about which there must be a liberal discretion, limited only by the rights of the wife in the homestead and by the rights of other persons acquired in the land while it is not part of the homestead.

The question of intention does become important in some points of view, as for instance, in determining whether or not a person has acquired a homestead at all, as in case of domicile, or whether he has abandoned his homestead, or which one of two houses, where he sometimes resides in each, is his homestead, or which of the two fields that are in use in connection with his rural occupation or calling, is to be preferred when both cannot be, and the like. But when a person is the occupant of a large tract of land, with a mansion house surrounded by or contiguous to his farm, which he uses in his calling as a means of support, most of the tract being woodland or prairie, or consisting of a number of tracts, some of which are not used at all, such facts determine substantially and approximately the locality of his homestead, and the locality of portions of the large tract not so used to be not his homestead or part of it, irrespective of his intention at the time. If he should wish to change the locality of his homestead on such large tract by moving his residence to another portion of his tract, or by changing the boundaries of it substantially different from the locality which the pre-existing facts of ostensible use and enjoyment have fixed for him, he must do it before other persons have acquired a right by valid lien or purchase on such portion

of the land as had not been a part of the homestead, and in such manner, by such use or actual designation, as not to permit others to be deceived or entrapped by the obvious appearances of his ostensible situation on his land. His specific intent in making the change either to defraud others who have rights attached to the land or to grab from them the most valuable land not previously used for homestead purposes for his own pecuniary advancement, and that alone, is therefore not the true test in determining the validity of the claim of homestead.

In the application of these principles to this case, the bond conveyed the right to the land it covered, if at the time it was given the said land was not a part of the homestead, as shown by the then existing facts of use and occupation pertaining to his home and premises ; and if the judgment lien was acquired on said tract, the Palmer survey, when it was no part of the homestead, the defendant could not change the homestead so as to cover any part of it necessary for the satisfaction of the judgment, if that tract was the only land out of which the lien could effectually be enforced in the satisfaction of said judgment.

The principles here announced do not necessarily apply to the case of a homestead purchased by one who had none before, against whom valid judgments are subsisting at the time, where the land is clearly made a homestead contemporaneously with the purchase. Nor is it in conflict with law giving an allowance for a homestead under our probate system, to the extent that special provision has been or may be made by statute on that subject. Both of these questions are not designed to be precluded from a consideration upon their own merits, when they may arise, by the views expressed in this opinion incidentally.

Whether in the case before us now the weight of evidence was in support of the verdict, it is unnecessary now to decide. The charge of the court, though evidently drawn with much care, does not, as we think, present the correct

rules of law as applicable to the facts of the case, and for that reason the judgment must be reversed and the cause remanded.

REVERSED AND REMANDED.