## W. H. ROBERTS v. N. CAWTHON.

Decided June 5, 1901.

**1.—Homestead—Urban or Rural.**

One can not have an urban and a rural homestead at the same time; but whether the particular place of residence is urban or rural is generally a question of fact; it may be rural though within jurisdictional limits of a municipal corporation; or urban when within the limits of a town or village not incorporated, though not platted, numbered, or designated as a lot.

**2.—Same—Question of Fact.**

See evidence under which it was error to hold that the place of residence in an unincorporated village, and upon ground not platted or numbered in lots, was in law a part of a rural homestead, and to include in the exemption with it farm property ten miles distant, situated in another county, and rented out for the support of the family.

**3.—Homestead—Use—Renting.**

Whether urban or rural, the homestead must be used as a residence or place of business; and property remote from the residence does not become homestead, as matter of law, by being rented out and the proceeds used for the support of the family.

Appeal from Falls. Tried below before Hon. Sam R. Scott.

*R. L. Allen, T. A. Blair* and *Rice & Bartlett,* for appellant.

*N. H. Atkinson,* for appellees.

KEY, ASSOCIATE JUSTICE.—W. H. Roberts, having a judgment against A. Cawthon, caused an execution to be levied upon 50 acres of land belonging to the latter. Cawthon and his wife brought an injunction suit to restrain Roberts and the sheriff from selling the land, they claiming it as part of their homestead and exempt from forced sale. They prevailed in the District Court, and Roberts has appealed, assigning numerous errors.

The execution was levied April 4, 1900. At that time Cawthon owned a farm in Falls County, consisting of the 50 acres in controversy,

and two other tracts, one containing 25 and the other 11 acres, in all 86 acres.  He also owned a two-acre tract upon which he and his family resided, in or near the town of Eddy in McLennan County.  This property was ten or twelve miles from the farm.

The testimony shows that Eddy is now a town or village of about 350 inhabitants.  That for several years prior to 1883 Cawthon and his family occupied and used the farm as their homestead.  That in 1883 he bought three acres of land about 350 yards from the depot at Eddy, built a house thereon and has resided there ever since.  Continuously since 1883 the farm has been rented—generally, but not all the time, for part of the crops, and all the rents have been used by Cawthon for the support of himself and family, consisting now of a wife and three children.

He testified that he moved to Eddy for the purpose of educating his children, but the oldest was at that time under four years of age.  Cawthon is a dentist and practiced his profession for several years in Eddy; but, owing to the condition of his health, abandoned his profession several years ago.  His wife has a small millinery business in Eddy.  He testified that when he moved to Eddy he thought he might return to the farm after educating his children; but said he had no fixed purpose, either then or now, to do so.

In 1886 Cawthon and his wife made a deed to Alice M. Spencer, conveying one acre of the three acres upon which they resided, in which deed they described the land as lying within the limits of the town of Eddy.

A plat of the town of Eddy, made by C. M. Curry, was put in evidence, showing a street designated Golinda street, in front of Cawthon's residence, and another street adjoining the Cawthon property on the south and connecting with Golinda street.  It also shows a church building across Golinda street a little distance south of the Cawthon property, but north of that and in front of part of the Cawthon property on the opposite side of Golinda street (designated by other witnesses as a road, and not a street) is a field; and in the rear of Cawthon's property on the east is another field.  Immediately north of Cawthon's property the plat shows two lots fronting on Golinda street, one, the acre sold off by Cawthon to Alice M. Spencer, and the other about the same size, marked "Howard."  This map shows that all the property between the Cawthon place and the railroad depot, is subdivided into small parcels, many of which are marked with the names of supposed owners.  Several are marked "store," two are marked "blacksmith shop," one "postoffice," one "livery stable," and one "tinshop."  The map also shows a number of spaces marked "street," some having names and others not named.  No numbers are placed upon any of the subdivisions indicated by this map.

C. M. Curry testified as follows: "I reside in Waco.  Have lived in the town of Eddy.  I moved there in September, 1883, and lived there until the latter part of 1895.  That was my home during that

time, but I didn't stay there all the time. In 1886 there were about 300 people in what was called and known as the town of Eddy; there were twelve stores in actual business use; also a lumber yard, across the railroad, where it is now; and a livery stable where it is marked livery stable on the map prepared under my direction; also a blacksmith shop. The linen paper diagram or map was made under my direction; I was on the ground. It is correct of the territory it undertakes to represent. The red lines indicate the water mains, and the small piping that goes into the buildings. I had charge of putting in the water system, and we completed it and began to charge water rent on the 10th day if January, 1894. There is a Clark addition, a Kincannon addition and a railroad addition. I am not able to locate the lines of the railroad addition, but I know the depot is on the railroad addition, and think it embraced all these business lots and the land marked 'Curry.' [Witness showed the location of the Kincannon addition on the map.] I am not sure whether Kincannon lives on the Kincannon or the railroad addition, but I think he lives on the Kincannon. I do not know where the Clark addition is. There are houses there which are not shown on the map, but are beyond the left side of the map. [Witness locates the Christian church on said linen map.] It was built there about 1893 or 1894, and has been used as a place of worship. [Witness locates a hotel at lower left hand corner of plat.] It is about 1500 feet from that to Dr. Cawthon's. The distance from the depot to Cawthon's is at least 1000 feet. The postoffice, for a good many years, has been located right in front of the depot on this business block. The Eddy high school is not represented on the map. It is a little ways further from Dr. Cawthon's than the postoffice. [Witness also located the other school building on the map.] Going from town towards that school house there are five or six houses. I think Mr. Jackson located the center of the population for the last six or eight years about right—that is, the residence portion of the town. The Bedicheck school building is further away from the center of population than Dr. Cawthon is; and the people living to the right and left of the map, not shown on it, live further away. Some of them are further away from the postoffice and business portion of town and some are not. There are six or seven families living to the left of the map that are about the same distance, or maybe a little nearer to the business portion of the town than Dr. Cawthon; they would be nearer this high school building, too. The present population of Eddy is between three and four hundred. I do not know how many children attend these schools; but the scientific and literary institute, as the old Bedicheck school is called, employs three teachers, and the high school employs two. I attended school at the institute when I first went there; there were about 125 pupils, which was about as high as we usually ran, though sometimes we would go over that; that was in 1887. The other school has had about the same attendance. When I went there Dr. Cawthon was practicing dentistry; he did a little work for me; I went to

his house when he did the work for me. I don't know whether he had any office or not. The place marked 'Howard,' beyond Dr. Cawthon's, if it was there before 1886, it was very new; I can not say when it was built. The Spencer place I think was built shortly after I went there. This alley between Cawthon and Walkup is open, as it is represented on the map; I think it is about thirty feet wide; it has been open ever since I knew the place; it connected with the other street; and this other street, (the one back of Dr. Cawthon's, and parallel with the one he lives on) was open down to the corner of Mr. Narmon and Sewell's corners, but it is now open all the way to town. I think the whole street has been open since 1888. I have the street in front of Dr. Cawthon's marked Golinda street. I got the name from Mr. Kincannon."

First cross: "I am an attorney. I did not represent the plaintiff in the original suit in which judgment was gotten against Dr. Cawthon. I am one of the attorneys in this case and made this map for use in this case. I wanted to get the evidence before the court, of course. The place I have marked 'Golinda street' I have never heard called the Waco and Eddy road. It runs towards Bruceville. Where that road ran before the town was built, I do not know. Jim Hayes lives out on the road between Bruceville and Eddy, nearly half a mile from Eddy, on the same road that Dr. Cawthon lives on. We put water in his pasture at the back of Dr. Cawthon's and it may have extended to his house since; I can not say as to that. I think the Kincannon addition was laid off into lots and blocks as property in towns usually is. The field in front of Cawthon's is a little further down towards town than I have marked it on the map; it is in front of Dr. Cawthon's. Beyond Dr. Cawthon's, on the road, are two houses, and then you go something like a quarter before you strike another house. I have marked this street between Cawthon's Walkup (say what street) thirty feet wide. I marked it a street because we always considered it a street. It is not macadamized nor paved. Nothing has been done in the way of keeping it up, but it has just been there, and has been used by the public."

Second direct: "The Hays place spoken of is northwest (on the map) from Dr. Cawthon's—back of him and beyond him. You go up this street in front of Dr. Cawthon's and then turn in here to the right to get to it. There are no macadamized streets or graded streets in Eddy. I marked this place between Dr. Cawthon's and Mr. Walkup as a street, because it is an open space there, and people live on each side of it, and it runs back to another street. I do not know to what addition to the town of Eddy the property in question belongs. It it has ever been platted as a part of the town I don't know it. This strip between Cawthon and Walkup is actually there, and is used by the public as a street, and that is why I so marked it, and the people reside on the places indicated on the map by their names."

It was shown that the town of Eddy had never been incorporated; that the Cawthon property was not on or part of the original plat of the

town, or any formal addition thereto; and other witnesses testified that the highways designated by Curry as streets were in fact public or private roads, and not known as streets.

The trial court instructed the jury that if the fifty acres of land levied upon was part of Cawthon's homestead, the verdict should be for the plaintiffs; and further instructed, that if the land was used by the plaintiffs for the maintenance and support of their family, then, under the law, it was part of their homestead. This latter charge is assigned as error; as well as the court's refusal to give several instructions requested by appellant,—one upon the subject of abandonment, and another to the effect that if the plaintiffs' residence was in the own of Eddy, the property in controversy was no part of their homestead, and therefore subject to forced sale.

We sustain appellant's contention on the three points referred to. It is well settled in this State that one can not have an urban and a rural homestead at the same time; and therefore, if there is testimony tending to show that the plaintiffs' residence was in fact urban, the court erred in not submitting that issue to the jury. Whether or not a given piece of property is rural or urban, is a question of fact to be determined upon a consideration of all the testimony, unless the undisputed evidence clearly shows that it is one or the other. Wilder v. McConnell, 91 Texas, 600. Inasmuch as Cawthon's residence property was purchased by him as rural property, sold by the acre, and as it had never been subdivided into lots and formally platted as a part of the town of Eddy, the trial court appears to have assumed that it was still rural property at the time appellant's execution was levied.

We do not regard this assumption as tenable. We are aware of the fact that in Taylor v. Boulware, 17 Texas, 75, the Supreme Court say that the term lot or lots, used in the Constitution, must be taken and construed in the popular sense of those terms; and, when so used, do not embrace land within the jurisdictional limits of a municipal corporation not connected with the plan of the municipality. But the court was then considering the effect of the mere extension of the corporate limits of a town, so as to include rural property, when nothing had been done by the municipal officers or anyone else, changing the conditions of the added territory; but it is now settled that property may be an urban homestead because within the limits if a town or village, though such town or village be unincorporated. Iken v. Olenick, 42 Texas, 197; Williams v. Willis, 84 Texas, 398. And, notwithstanding what was said by the court in Taylor v. Boulware, supra, we do no not regard it as absolutely essential that property within a city, town, or village must be platted, designated, and numbered as a lot, in order to bring it within the meaning of the constitutional provision declaring that the homestead in a city, town or village 'shall consist of lot or lots, when used for the purposes of a home, or as a place to exercise the calling or business of the head of a family." Such a literal construction

of the Constitution might deprive a family of an important homestead right that did not exist at the time the case of Taylor v. Boulware, supra, was decided. Since then the homestead exemption has been enlarged so as to include business property used by the head of the family; and it is possible that such property might be in the heart of a city and originally designated for a park, and never designated or numbered as a lot; or, the owner of a tract of land where several roads intersect might sell property by the acre, or in other small quantities, and such holdings might be improved and occupied by fifty families in such manner as to constitute a town or village, and yet none of the property be platted or designated as lots, although there might be storehouses upon one or more of such holdings. In either of the cases stated, it is believed that the spirit of the constitutional provision referred to would have application, and the property thus used for business purposes be held to be homestead.

Several cases have been cited by counsel for appellee claimed to be analogous to this case, and in which the property was adjudged to be rural and not urban homestead; but in none of them had the trial court refused to submit the question to the jury. And in this case, if such submission had been made and the decision been in favor of appellees, it may be that such decision would not have been disturbed on appeal.

The case of Wilder v. McConnell, supra, cited and relied upon by counsel for appellees, supports our ruling, that whether the residence property is rural or urban within the meaning of the Constitution was a question of fact. That case is also authority upon the proposition that property need not necessarily be platted and numbered as city or town lots, in order to make it an urban homestead; because, in that case, it was shown by clear and undisputed evidence that the property there involved had not been so platted and numbered, and yet the Supreme Court held. that whether or not it was rural or urban was a question of fact, and the finding of the trial court "that it was part of the rural homestead" could not be overturned by the Supreme Court upon the theory that there was no evidence to support such finding, "although (say the court) we might come to a different conclusion from the evidence."

Section 51, article 15, of the Constitution, reads as follows: "The homestead not in a town or city shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town, or village shall consist of lot or lots, not to exceed in value five thousand dollars at the time of their designation as the homestead, without reference to the value of any improvements thereon; provided that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the head of a family; provided, also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired."

The two provisos contained in this section have reference to both

classes of homestead, so that rural, as well as urban property, must be used for the purposes of a home in order to bring it within the purview of the Constitution. Haskell v. Forbes, 27 S. W. Rep., 566; Baldeschweiler v. Shipp, 21 Texas Civ. App., 80. The phrase referred to, "for the purposes of a home," as used in the Constitution, is not restricted in its meaning to the use of the property as a mere residence or habitation; but nevertheless, as to urban homesteads, it has been repeatedly held that lots not occupied for residence or business purposes, nor used in connection with the residence for the support, convenience, or comfort of the family are no part of the homestead, although they may yield revenue applied to the support of the family. Iken v. Olenick, supra; Blum v. Rogers, 71 Texas, 668, and 78 Texas, 530. No sound reason is perceived why the same rule should not apply in reference to rural homesteads. The particular facts that will constitute a use for the purposes of a home may be different in two classes of cases; but in either, the property not occupied as a residence must be used in connection with and in substance as a part of the property so occupied.

To declare as matter of law that each tract of land occupied by the family or used for its support and maintenance, when all together do not exceed 200 acres, is part of the homestead, regardless of its remoteness from the family residence and the length of time that it has been rented out and not occupied or used by the family, is stating the law too broadly in favor of the homestead exemption. Railway v. Winter, 44 Texas, 597. It is true that disconnected tracts of land may constitute parts of a homestead, when they are used for the purposes of a home; but it is not true, in all cases, that the mere use of the rents derived from a particular tract of land for the purpose of maintaining and supporting the family will constitute a use of such land for the purposes of a home. Haskell v. Forbes, supra. For, if such was the case, a family might reside for thirty years in a rented house outside of a city, town, or village in one county, and hold as a homestead a 200-acre farm 500 miles away and in another county, by appropriating the rents derived therefrom to the support of the family; because if the mere use of the rents of the farm for the support of the family will constitute it homestead, then it is immaterial whether the family own the property upon which they reside, and whether the farm be connected with or hundreds of miles from the residence. The case of Baldeschweiler v. Shipp, supra, was, in some respects, but not in all, analogous to the case under consideration; and Mr. Justice Williams there said: "The Constitution, when it permits the homestead to consist of one or more parcels, provided they are used for the purpose of a home, does not mean that the parcels must be a mere appendage or incident of the residence; but the purposes referred to include all such as the land is properly put to by the head of the family in following a country pursuit, and thereby securing to his family not only a dwelling place, but the means necessary to its enjoyment. The mere fact that means realized from the use of the property separated from that upon which

residence is situated are used in supporting the family, is not claimed, of itself, to work the exemption in all cases. But where all the land is employed by the head of the family in the pursuit of his business appropriate to the country, such as farming, and used together for the same purpose of sustaining the family in the home, we can see no reason for saying that it is not all exempt. Nor can we see that the character of the arrangement by which he utilizes it for such purposes, whether by his own labor, by that of hired hands, or of tenants, should be made decisive. By any or all of these methods of farming the land may be made the means of maintaining the home and supporting the family.

"The land here in question was actually used in the same way and for the same purposes as that upon which the party lived. All was done under a scheme devised by which it might best be made available for the support of the family. This manner of use was adapted to his condition and that of the family, and was one to which the property was adapted."

It will be noted that the opinion quoted from concedes the proposition that the mere fact that means realized from the use of the property separated from that upon which the residence is situated, are used in supporting the family will not, of itself, fix homestead character upon the property. The opinion points out other matters that are to be considered in determining the question of homestead in such cases.

The charge should have instructed the jury that in order to find that the property in controversy was part of the plaintiffs' homestead, it was necessary for the proof to show that at the time it was levied upon it was used by them for the purposes of a home, coupled with an explanation of the purport and meaning of the latter phrase, as expounded in Iken v. Olenick, Blum v. Rogers, and Baldeschweiler v. Shipp, supra. The failure to so modify the charge given constitutes positive error; and, being complained of by appellant, requires a reversal of the case.

*Reversed and remanded.*